IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| FREDERICK W. BROADHEAD, D.M.D., PC, *et al.*, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil Action No. 5:15-cv-00020<br>)<br>) By: Elizabeth K. Dillon |
| DIANE GLASSCOE WATTERSON, *etc.*, *et al.*, | ) United States District Judge<br>)<br>) |
| Defendants. | ) |

**MEMORANDUM OPINION**

This case arises from a business relationship gone sour. In 2010, plaintiff Frederick W. Broadhead, D.M.D., and his then-partner Harry H. Heard, D.D.S., hired defendant Dianne Glasscoe Watterson to evaluate their dental practice, Front Royal Dental Care. The parties entered into two one-year consulting contracts.

Sometime in 2012, Drs. Broadhead and Heard got into a business dispute. Five years earlier, Dr. Heard had agreed to sell Front Royal to Dr. Broadhead. Under the terms of their deal, Dr. Broadhead was to make the second and final payment to Dr. Heard on October 31, 2012. As that date approached, however, Dr. Heard had a change of heart and wanted to remain a part owner of Front Royal. When Dr. Broadhead refused to alter their deal, Dr. Heard resigned from Front Royal and set up a competing dental practice. Dr. Broadhead then brought an arbitration against Dr. Heard, which resulted in a settlement.

Dr. Broadhead thinks that Watterson used information she acquired during her consulting for Front Royal to hurt him in his dispute with Dr. Heard and that she helped Dr. Heard set up his

competing practice  As a result, Dr. Broadhead believes that Watterson exacerbated the dispute and that she is thus responsible, at least in part, for the ensuing arbitration.

Seeking to recover the attorney's fees that he incurred in the arbitration and other relief, Dr. Broadhead and his business, plaintiff Frederick W. Broadhead, D.M.D., PC (FWB), the current owner of Front Royal, filed this case against Watterson and her business, defendant Professional Dental Management, Inc. (PDM), alleging claims for breach of fiduciary duty and business conspiracy.  Watterson and PDM now move to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief may be granted.  For the following reasons, the court will grant the motion as to the breach-of-fiduciary-duty claim, but deny it as to the business-conspiracy claim.

I. BACKGROUND

The facts recited in this section and relied on below are taken from Dr. Broadhead and FWB's complaint and documents attached to it.  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015).  For purposes of Watterson and PDM's motion to dismiss, the court accepts the complaint's well-pleaded factual allegations as true and construes them in the light most favorable to Dr. Broadhead and FWB.  *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 189 (4th Cir. 2010).

**A. Dr. Heard agrees to sell Front Royal to Dr. Broadhead.**

In 2007, Dr. Heard agreed to sell Front Royal to Dr. Broadhead, and they entered into a purchase agreement.  (Compl. ¶¶ 8–9 , Dkt. No. 7-1.)  Under the terms of the agreement, Dr. Broadhead was to make two payments—one on October 31, 2007, and another on October 31, 2012.  (*Id.* ¶ 9.)  During the intervening five years, Drs. Heard and Broadhead were to act as co-

2

owners of the practice. (*Id.* ¶ 10.) After the second payment, Dr. Heard had the option of becoming an employee. (*Id.*)

**B. Drs. Heard and Broadhead hire Watterson.**

In February 2010, Drs. Heard and Broadhead sought out the services of a consultant to evaluate Front Royal's strengths and weaknesses and to make recommendations on how to improve its efficiency and profitability. (*Id.* ¶ 12.) The next month, they hired Watterson, signing a one-year consulting contract (First Contract). (*Id.* ¶ 13; Compl. Ex. A, Dkt. No. 7-1.)

As relevant here, the First Contract—which comprises only a single page—provides:

> **Terms and Conditions**
>
> We agree to confidentiality regarding all information of a proprietary nature which we may encounter in our work with your practice. All names and locations will be kept in strict confidentiality. We will be using consulting methods and material which is proprietary to our business. You and your staff agree to confidentiality regarding such material, and to restrict its use to the purpose of the engagement.
>
> . . . .
>
> **General Provisions**
>
> My clients, Drs. Harry Heard and Fred Broadhead, clearly understand their full responsibility in generating and implementing any results from, or related to, our work together. Professional Dental Management is hereby released and discharged of any liability whatsoever from the practice and from any and all participants involved in the in-office consultation and related consulting activities.

(Compl. Ex. A.)

PDM's name appears next to Watterson's at the top and bottom of the First Contract but without a corporate designation such as "Inc." (*Id.*) And Watterson's name appears without a corporate title such as "CEO." (*Id.*)

Over the next year, Watterson visited Front Royal several times. (Compl. ¶ 16.) During her visits, she met with Drs. Heard and Broadhead and staff members; she asked staff members

3

and patients to fill out surveys and evaluations; and she reviewed the practice's "production analysis, collections and payment data, scheduling data, tax returns, fee schedules, and insurance tracking data." (*Id.* ¶¶ 15–19.) Watterson prepared a report titled "Practice Overview" from the information she obtained. (*Id.* ¶ 20.)

In March 2011, Drs. Heard and Broadhead decided to retain Watterson for another year, signing a new one-year consulting contract (Second Contract)—also just a page. (*Id.* ¶ 21; Compl. Ex. B, Dkt. No. 7-1.) Like the First Contract, the Second Contract contains confidentiality and release provisions. The confidentiality provisions are identical, and the release provisions differ in only two material respects: unlike the release provision in the First Contract, the release provision in the Second Contract names Front Royal as a client and designates PDM as a corporation. (Compl. Ex. B.) Also unlike the First Contract, the Second Contract identifies Watterson as PDM's CEO. (*Id.*)

During the next year, Watterson continued to visit Front Royal, analyze its various data, and provide advice on how to increase its efficiency and profitability. (Compl. ¶ 22.) She used the information she acquired to prepare a second report titled "Front Royal Dental Care Summary Report." (*Id.* ¶ 23.) When the Second Contract expired on April 1, 2012, Drs. Heard and Broadhead decided against retaining Watterson for another year. (Compl. Ex. B.)

**C. Drs. Heard and Broadhead get into a business dispute.**

Sometime in 2012, Drs. Heard and Broadhead got into a business dispute. (Compl. ¶ 24.) Dr. Heard did not want to go through with the sale of Front Royal. (*Id.*) Instead, he wanted to remain a co-owner of the practice. (*Id.*) Dr. Broadhead, however, wanted to complete the sale as planned and believed that Dr. Heard's about-face violated the purchase agreement (*Id.* ¶ 25.) In

4

November 2012, Dr. Heard resigned from Front Royal and set up a competing dental practice the following month. (*Id.* ¶¶ 29, 31.)

Watterson took Dr. Heard's side in the dispute and used information that she obtained during her consulting for Front Royal to hurt Dr. Broadhead. (*Id.* ¶ 39.) She advised Dr. Heard on how to leave Front Royal and what to say to staff members to induce them to leave as well. (*Id.* ¶ 30.) She also counseled Dr. Heard on how to set up a competing practice. (*Id.* ¶ 32.) Further, in April 2013, she drafted a letter addressed "to whom it may concern," disclosing her observations and evaluations of Drs. Heard and Broadhead and Front Royal. (*Id.*) The letter reads:

> As the business consultant for Front Royal Dental Care from April, 2010–April, 2012, I was privy to production/collection information and all business stats regarding overhead and operational expenses. Even during the sluggish economy, the business continued to exhibit steady growth and profitability. Dr. Heard, the senior partner, was always the high producer. My observation was that he was well-liked and respected by the patients and staff members. I would characterize him as friendly and articulate when discussing dental needs with patients. He enjoyed significant popularity in the community at large.
>
> I was also aware of a continuing conflict between the partners, Dr. Harry Heard and Dr. Fred Broadhead. When Dr. Broadhead began to seriously consider exercising his option to buy out Dr. Heard and bring in his sister (who is also a dentist), I urged him to reconsider due to the possible negative consequences to the practice. At the time, Dr. Heard's average monthly production was in the $80K range. I asked Dr. Broadhead how he was going to deal with the loss of this production. The real value of any dental practice lies in the patient base, and I feared significant attrition of patients when they discovered Dr. Heard was no longer practicing there.
>
> I also knew that Dr. Heard was not ready to leave clinical dentistry and would (most likely) continue to practice somewhere else. I had no doubt that Dr. Heard's departure would not be received well by patients, especially if they were uninformed.
>
> My position has always been the health of the business. I hoped I would be able to help the doctors overcome their differences for the good of the business. Unfortunately, business decisions were made that went against my advice. The

5

consequences of those decisions may produce negative outcomes for years to come.

(Compl. Ex. C, Dkt. No. 7-1.)

Watterson did not disclose any of these actions to Dr. Broadhead. (Compl. ¶ 42.) In fact, she attempted to conceal or minimize them when he later learned of them. (*Id.*)

### D. Dr. Broadhead commences arbitration against Dr. Heard.

To enforce his rights under the purchase agreement, Dr. Broadhead initiated arbitration against Dr. Heard. (*Id.* ¶ 33.) Dr. Broadhead claimed that Dr. Heard had breached the agreement by (among other actions) disparaging him to Front Royal's staff members and patients, counseling staff members to leave the practice, and soliciting patients for his new practice. (*Id.* ¶¶ 26–28, 31.)

In the arbitration, Dr. Broadhead obtained copies of e-mails that Watterson sent to Dr. Heard in 2012 and 2013, in which she discussed (among other topics) the strained relationship between Drs. Heard and Broadhead, the sale of Front Royal, Dr. Broadhead's ability to run the practice after the sale was completed, and Dr. Heard's new practice. (*Id.* ¶ 36.) Dr. Broadhead also acquired e-mails between Watterson and a Front Royal staff member, in which she advised the staff member on how to find other employment. (*Id.* ¶ 36.)

Before the arbitration ended, Drs. Heard and Broadhead were able to reach a settlement. (*Id.* ¶ 33.) Dr. Broadhead incurred over $250,000 in attorney's fees in resolving his dispute with Dr. Heard. (*Id.*)

### E. Dr. Broadhead and FWB sue Watterson and PDM

Dr. Broadhead believes that Watterson exacerbated his dispute with Dr. Heard and is therefore at least partly responsible for the resulting arbitration. (*Id.* ¶ 34.) Hence, Dr. Broadhead, together with FWB, brought this case against her and PDM in the Circuit Court of

6

Warren County, Virginia, seeking to recover the attorney's fees that he incurred in the arbitration and other relief. (*Id.* ¶¶ 66–69, 80–82.)

In their complaint, Dr. Broadhead and FWB make two tort claims. First, they assert a breach-of-fiduciary-duty claim. (*Id.* ¶¶ 53–69.) They allege that Watterson and PDM were agents of Dr. Broadhead and Front Royal and so owed them fiduciary duties. (*Id.* ¶ 55.) Dr. Broadhead and FWB further allege that Watterson and PDM breached those duties by (among other actions) providing Dr. Heard's lawyers with information about Dr. Broadhead to use in the arbitration, drafting the to-whom-it-may-concern letter, counseling Dr. Heard on how to start a competing practice, and failing to disclose that Watterson was helping Dr. Heard in the arbitration. (*Id.* ¶¶ 60–64.)

And second, Dr. Broadhead and FWB assert a business-conspiracy claim. (*Id.* ¶¶ 70–82.) They allege that Watterson, either individually or through PDM, conspired with Dr. Heard to willfully and maliciously injure Dr. Broadhead in his business by (among other actions) pushing Dr. Heard to start a competing practice, encouraging Dr. Heard to tell Front Royal's staff members that their jobs were in jeopardy, casting aspersions on Dr. Broadhead's management skills, advancing Dr. Heard's false claim that Dr. Broadhead was forcing him out of Front Royal because of personal greed, disclosing confidential information to Dr. Heard's attorneys, and destroying communications with Dr. Heard. (*Id.* ¶¶ 32, 34–35, 39, 46–48, 70, 72–74, 77–80.)

Dr. Broadhead and FWB seek to pierce the corporate veil and hold Watterson jointly and severally liable with PDM. (*Id.* ¶ 52.) They allege that she failed to follow the corporate formalities in her dealings with them and so she has forfeited the corporate shield of PDM. (*Id.* ¶¶ 50–51.)

Watterson and PDM timely removed the case to this court on the basis of diversity jurisdiction and now move to dismiss under Rule 12(b)(6) for failure to state a claim on which relief may be granted. (Defs.' Notice of Removal 1–4, Dkt. No. 1; Defs.' Mot. to Dismiss 1, Dkt. No. 5.)

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a plaintiff's complaint to determine whether the plaintiff has properly stated a claim. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To avoid dismissal, the "complaint must establish 'facial plausibility' by pleading 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 554 (4th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In essence, the plaintiff must "nudge [his] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In deciding whether the plaintiff has met this plausibility standard, the reviewing court must take as true all well-pleaded facts in the complaint and in any documents attached or integral to it. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Further, it must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards*, 178 F.3d at 244, but it need not "accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). And if there is a conflict between the bare allegations of the complaint and any attached or incorporated document, then the document prevails. *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).

## III. DISCUSSION

### A. Virginia law governs Dr. Broadhead and FWB's claims.

Because its jurisdiction over this case rests on diversity of citizenship, the court must apply the substantive law of the forum state—Virginia—including its choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In matters of tort, Virginia applies the doctrine of *lex loci delicti*—or the law of the place of the wrong—to choice-of-law questions. *Dreher v. Budget Rent-A-Car Sys., Inc.*, 634 S.E.2d 324, 327 (Va. 2006). Here, the alleged wrong occurred in Virginia, so its law governs Dr. Broadhead and FWB's claims.

### B. The court cannot reach the merits of PDM's release defense at this early stage in the case.

At the outset, PDM contends that Dr. Broadhead and FWB's claims against it are barred by the Second Contract's release provision. (Defs.' Br. 8–10, Dkt. No. 6.) That provision states:

> My client [sic], Front Royal Dental Care, Drs. Heard and Broadhead, clearly understands [sic] their full responsibilities in generating and implementing any results from, or related to, our work together. Professional Dental Management, Inc. is hereby released and discharged of any liability whatsoever from the practice and from any and all participants involved in the in-office consultation and related consulting activities.

(Compl. Ex. B.) PDM submits that this "release applies to past, present and future claims," and thus bars Dr. Broadhead and FWB's claims here. (Defs.' Reply Br. 3, Dkt. No. 14.)

In response, Dr. Broadhead and FWB first argue that the release does not bar their claims because its language does not contemplate the release of future torts that are unrelated to the contracted-for services. (Pls.' Br. 4–5, Dkt. No. 10.) They also contend that the release does not apply to Front Royal's successors in interest and so it cannot bar FWB's claims. (*Id.* at 6.)

9

The court cannot determine the applicability of PDM's release defense at this juncture in the case. A release defense is an affirmative defense under Federal Rule of Civil Procedure 8. Ordinarily, a court cannot reach the merits of an affirmative defense on a Rule 12(b)(6) motion because such a defense does not affect the legal sufficiency of a plaintiff's complaint. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *Edwards*, 178 F.3d at 243. "But in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman*, 594 F.3d at 464. This exception only applies, though, when "all facts necessary to the affirmative defense "clearly appear[] *on the face of the complaint.*" *Id.* (alteration in original) (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)); *see also Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 360 (4th Cir. 2013) ("It is not obvious to us that incorporation by reference is appropriate in this context given our holding in *Goodman* that a district court may consider only 'the face of the complaint.'" (quoting *Goodman*, 728 F.3d at 464)).

Here, all facts essential to PDM's release defense do not clearly appear on the face of Dr. Broadhead and FWB's complaint. Indeed, there is no mention of the release provision on the complaint's face. Accordingly, it is inappropriate for the court to address the merits of PDM's release defense at this early stage in the case.[1] *See Manchanda v. Hays Worldwide, LLC*, No. 1:14-cv-1339, 2014 U.S. Dist. LEXIS 174297, at *6 n.2 (E.D. Va. Dec. 17, 2014) (refusing to

---

[1] The court nevertheless notes for the parties' benefit that, based on its initial review, it questions the validity of the release provision in light of its seemingly endless scope. If read as PDM urges, the provision would encompass all future claims, including those for personal injury arising from PDM's own negligence. But "pre-injury release provisions pertaining to future negligence are void as against public policy" under Virginia law. *Estes Express Lines, Inc. v. Chopper Express, Inc.*, 641 S.E.2d 476, 478 (Va. 2007). PDM is of course free to show otherwise at the proper stage in the case.

10

rule on the applicability of a release defense on a Rule 12(b)(6) motion because the facts necessary to the defense were not present on the face of the complaint).

### C. Dr. Broadhead and FWB fail to state a plausible breach-of-fiduciary-duty claim against Watterson and PDM.

Next, Watterson and PDM contend that Dr. Broadhead and FWB fail to state a plausible breach-of-fiduciary-duty claim against them because they do not allege sufficient facts to show the existence of a fiduciary duty. (Defs.' Br. 11.) The court agrees.

To state a plausible breach-of-fiduciary-duty claim under Virginia law, a plaintiff must allege enough facts to prove (1) the existence of a fiduciary duty, (2) the breach of that duty, and (3) resulting damages. *Carstensen v. Chrisland Corp.*, 442 S.E.2d 660, 666–67 (Va. 1994). Here, Dr. Broadhead and FWB fail to plead adequately even the first of these elements. They claim that Watterson and PDM were agents of Dr. Broadhead and Front Royal and, as such, owed them various fiduciary duties. But Dr. Broadhead and FWB do not allege sufficient facts to establish that an agency relationship existed.

In Virginia, "[a]gency is a fiduciary relationship resulting from one person's manifestation of consent to another person that the other shall act on his behalf and subject to his control, and the other person's manifestation of consent so to act." *Reistroffer v. Person*, 439 S.E.2d 376, 378 (Va. 1994). "The criterion for determining whether a relationship is one of principal-agent or master-servant, on the one hand, or independent contractor on the other, is control or right to control the methods or details of doing the work, not control of the results." *Wells v. Whitaker*, 151 S.E.2d 422, 429 (Va. 1966); *see also Allen v. Lindstrom*, 379 S.E.2d 450, 454 (Va. 1989).

"The law indulges no presumption that an agency exists." *Raney v. Barnes Lumber Corp.*, 81 S.E.2d 578, 584 (Va. 1954). Quite the contrary. A person "is legally presumed to be

11

acting for himself and not as the agent of another." *Id.* Whether an agency relationship exists is a question for the fact-finder unless the relationship rests on undisputed facts or unambiguous documents. *Schwartz v. Brownlee*, 482 S.E.2d 827, 829 (Va. 1997); *Murphy v. Holiday Inns, Inc.*, 219 S.E.2d 874, 875 (Va. 1975). The party who asserts that an agency relationship exists bears the burden of proving it. *Raney*, 81 S.E.2d at 584.

In this case, Dr. Broadhead and FWB appear to base the alleged agency relationship on the consulting contracts, for they submit that the relationship began when the First Contract was executed in March 2010 and ended when the Second Contract expired in April 2012. (Compl. ¶ 22; Compl. Exs. A–B; Pls.' Br. 9.) Neither contract, however, includes the manifestations of consent required to create an agency relationship. That is, the contracts do not say—either expressly or impliedly—that Dr. Broadhead and Front Royal agree that Watterson and PDM will act on their behalf and subject to their control, nor that Watterson and PDM agree that they will so act.

And though an agency relationship may also "be inferred from the conduct of the parties and from the surrounding facts and circumstances," *Drake v. Livesay*, 341 S.E.2d 186, 189 (Va. 1986), Dr. Broadhead and FWB fail to allege enough facts to support such an inference here. They allege that from March 2010 to April 2012, Watterson observed Front Royal, reviewed its records, met with its owners and staff members, and prepared two reports. Nothing in these facts suggests that Dr. Broadhead and Front Royal had agreed that Watterson and PDM would act on their behalf and subject to their control, or that Watterson and PDM had agreed that they would so act.

The utter absence of the essential manifestations of consent for an agency relationship to exist makes this case readily distinguishable from *Bocek v. JGA Associates, LLC*, 616 F. App'x

12

567 (4th Cir. 2015)—a case on which Dr. Broadhead and FWB substantially rely to sustain their breach-of-fiduciary-duty claim. In that case, a physician hired a consultant to help him acquire a medical practice. *Id.* at 568. But instead, the consultant purchased the practice for himself. *Id.* So the physician sued him for (as relevant here) breach of fiduciary duty. *Id.* at 571. After a bench trial, the district court granted judgment to the consultant, ruling that the physician failed to prove that the consultant "had an agency relationship with him such that fiduciary duties would arise." *Id.* at 572.

The Fourth Circuit reversed and remanded for a new trial on damages only. *Id.* at 578. It held that the physician did establish an agency relationship with the consultant because "[t]he only conclusion to be drawn from the record [was] that the parties both assented to [the consultant's] acting as [the physician's] agent in their dealings with" the seller of the practice. *Id.* at 574. In making this determination, the Fourth Circuit relied on the following facts:

- The physician paid the consultant for his services.

- The consultant conceded that what he was to be doing, he would be doing for the physician and acting subject to his instructions and directions.

- The parties' consulting contract provided that the consultant would have the right to act as the physician's agent.

- The consultant communicated with the trustee responsible for the sale of the practice and obtained information on the practice's assets on the physician's behalf.

*Id.* at 568, 574.

Like the consultant in *Bocek*, Watterson and PDM were paid for the services they rendered. But that is where the similarities between that case and this one end. Under the facts alleged here, Watterson and PDM did not assent to act on behalf of Dr. Broadhead and Front Royal and subject to their instructions and directions; nor did Watterson and PDM communicate with or obtain information from a third party on behalf of Dr. Broadhead and Front Royal in

13

connection with a contemplated acquisition. What is more, neither of the consulting contracts gave Watterson and PDM the right to act as agents of Dr. Broadhead and Front Royal in any respect.

Since the manifestations of consent necessary to establish an agency relationship are totally lacking under the facts alleged in this case, the court concludes that Dr. Broadhead and FWB do not allege enough facts to demonstrate that Watterson and PDM owed him and Front Royal fiduciary duties on the basis of such a relationship. The court thus holds that Dr. Broadhead and FWB fail to state a plausible breach-of-fiduciary-duty claim against Watterson and PDM, and it will dismiss that claim without prejudice.[2]

### D. Dr. Broadhead and FWB state a plausible business-conspiracy claim against Watterson and PDM.

Watterson and PDM further argue that Dr. Broadhead and FWB fail to state a plausible business-conspiracy claim against them because they do not allege sufficient facts to establish the requisite willfulness and maliciousness. (Defs.' Reply Br. 10.) The court disagrees.

Dr. Broadhead and FWB's business-conspiracy claim arises under Virginia Code §§ 18.2-499 and -500. (Compl. ¶ 81; Defs.' Br. 10.) To state a plausible claim under those statutes, a plaintiff must allege sufficient facts to show "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business, and (2) resulting damage to plaintiff." *Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 596 (Va. 1984). A plaintiff is not required to prove actual malice but only legal malice—i.e., "that the defendant acted intentionally, purposefully, and without lawful justification." *Advanced Marine Enters. v. PRC, Inc.*, 501 S.E.2d 148, 155 (Va. 1998). Nor is a plaintiff obligated to show that "a

---

[2] Watterson and PDM also contend that Dr. Broadhead and FWB's breach-of-fiduciary-duty claim fails under the source-of-duty or economic-loss rule. (Defs.' Br. 10–12.) The court need not, and does not, address the application of either rule here in light of its conclusion that the claim fails because Dr. Broadhead and FWB do not sufficiently plead the existence of a fiduciary duty in the first place.

14

conspirator's primary and overriding purpose is to injure another in his trade or business." *Simmons v. Miller*, 544 S.E.2d 666, 677 (Va. 2001).

Here, Dr. Broadhead and FWB adequately plead both elements of a business-conspiracy claim. As to the first, they allege that Watterson, either individually or through PDM, combined with Dr. Heard and took various actions to hurt Dr. Broadhead in his business. (Compl. ¶ 71.) Among other actions, she pushed Dr. Heard to start a competing practice, encouraged Dr. Heard to tell Front Royal's staff members that their jobs were in jeopardy, cast aspersions on Dr. Broadhead's management skills, advanced Dr. Heard's false claim that Dr. Broadhead was forcing him out of Front Royal because of personal greed, disclosed confidential information to Dr. Heard's attorneys, and destroyed communications with Dr. Heard. (*Id.* ¶¶ 32, 34–35, 39, 46–48, 70, 72–74, 77–80.) These actions, in the court's view, are sufficient to support the inference that Watterson, in combination with Dr. Heard, acted intentionally, purposefully, and without lawful justification to injure Dr. Broadhead in his business.

With respect to the second element, Dr. Broadhead and FWB allege that he was harmed in his business as a result of Watterson's actions. (*Id.* ¶ 71.) Among other actions, he was compelled to spend considerable time with Front Royal's staff members to reassure them that he was not going to fire them and that the practice was being properly managed, and forced to expend substantial money to arbitrate his dispute with Dr. Heard. (*Id.* ¶¶ 35, 70, 76, 80.) The court thinks that these allegations are adequate to support the inference that Watterson's actions injured Dr. Broadhead in his business.

Accordingly, the court holds that Dr. Broadhead and FWB state a plausible business-conspiracy claim against Watterson and PDM, and it will not dismiss that claim.[3]

---

[3] Watterson and PDM also argue that Dr. Broadhead and FWB's business-conspiracy claim fails under the intracorporate-immunity doctrine. (Defs.' Br. 12–14.) They submit that, if they really were agents of Dr.

15

### E. PDM's corporate status does not shield Watterson from personal liability for her own tortious acts.

Lastly, Watterson contends that Dr. Broadhead and FWB fail to allege sufficient facts to pierce PDM's corporate veil and impose personal liability on her. (Defs.' Br. 14–16.) In response, Dr. Broadhead and FWB submit that their use of the phrase "piercing the corporate veil" in the complaint was inaccurate because they are not trying to hold Watterson liable in her corporate capacity; rather, they are trying to hold her liable in her individual capacity. (Pls.' Br. 10–11.)

The court agrees with Watterson that Dr. Broadhead and FWB do not allege enough facts to support piercing PDM's corporate veil. But they do allege sufficient facts to establish that she, herself, committed the tortious acts giving rise to their business-conspiracy claim. And the corporate shield does not protect corporate officers from being held jointly and severally liable with the corporation when their own tortious conduct is the basis of the liability. *Sit-Set, A.G. v. Universal Jet Exch., Inc.*, 747 F.2d 921, 929 (4th Cir. 1984); *Airlines Reporting Corp. v. Pishvaian*, 155 F. Supp. 2d 659, 666 (E.D. Va. 2001); *Greenberg v. Commonwealth ex rel. AG*, 499 S.E.2d 266, 269 (Va. 1998).

---

Broadhead and Front Royal as the complaint alleges, then they were also agents of Dr. Heard and so a conspiracy with him would be a legal impossibility under the doctrine. (*Id.* at 13–14.)

The court does not address the merits of this contention for two reasons. First, as explained above, Dr. Broadhead and FWB do not sufficiently plead that Watterson and PDM were agents. And second, even if they did, all facts necessary to establish the application of the doctrine do not appear on the face of the complaint. In particular, the complaint does not show that Watterson and PDM were acting within the scope of their agency when they committed the tortious acts giving rise to the conspiracy. *See Fox v. Deese*, 362 S.E.2d 699, 708 (Va. 1987) ("If the defendants were acting within the scope of their employment and, therefore, were agents of the City, then only one entity exists—the City. By definition, a single entity cannot conspire with itself. However, as we previously have noted, whether the defendants were acting within the scope of their employment is an issue that requires an evidentiary hearing.").

Because PDM's corporate status does not shield Watterson from personal liability for her own tortious acts, the court will not dismiss Dr. Broadhead and FWB's business-conspiracy claim as to her.

IV. CONCLUSION

For the foregoing reasons, the court will grant Watterson and PDM's motion to dismiss as to Dr. Broadhead and FWB's breach-of-fiduciary-duty claim and dismiss that claim without prejudice, but it will deny the motion as to their business-conspiracy claim.

An appropriate order will follow.

Entered: February 24, 2016.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge